# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES of AMERICA | : | CRIMINAL Nos. |
| --- | --- | --- |
|  | : | 08-654-1 |
| v. | : | 08-654-2 |
|  | : |  |
| RONALD HILLS and | : |  |
| SHEREE GETER-HILLS | : |  |

# M E M O R A N D U M

PRATTER, J.  DECEMBER 22, 2009

Sheree Geter-Hills is charged with knowingly and intentionally possessing with intent to distribute more than five grams of crack cocaine, in violation of two provisions of the Controlled Substances Act.[1] She is also charged with aiding and abetting the possession with intent to distribute of the same crack cocaine, in violation of 18 U.S.C. § 2.

Ms. Geter-Hills moves to suppress, as proposed evidence at her trial, crack cocaine recovered from her home by Philadelphia police officers during a search conducted on August 22, 2008. She also moves to suppress certain statements that she is alleged to have made incident to that search. In addition, Ms. Geter-Hills moves to introduce certain statements alleged to have been made by her husband and co-defendant, Ronald Hills.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case has its genesis in a robbery that allegedly occurred on August 21, 2008, during the course of which a man took a bank envelope containing $600 from an older married couple.[2]

---

   [1]   21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B).

   [2]   Hereinafter, this incident will be referred to as "the August 21 robbery." Ms. Geter-Hills has not been charged in connection with the alleged robbery, and the facts of the robbery are not relevant here.

As they investigated this robbery, the police discovered evidence that led them to suspect a man named Ronald Hills. Using this evidence, the police obtained a warrant to search a home at 5839 Crittenden Street in Philadelphia, where they believed Mr. Hills was living. On the morning of August 22, 2008, a group of officers searched the Crittenden Street house. Though the police found mail addressed to Mr. Hills at that location, the house was vacant.

The officers then drove a short distance to 2059 Medary Avenue, a property owned by Mr. Hills' wife, Sheree Geter-Hills. Among the officers who arrived at the 2059 Medary Avenue house on the morning of August 22 were Sergeant Gary Ferguson and Detective Joseph Cremen, who were joined by two other detectives, and four or five members of the police department's warrant unit.[3] They arrived in three vehicles. When the officers reached the house, Mr. Hills was on the porch. The police promptly arrested Mr. Hills, and they told him that he was being arrested based on his suspected involvement in the August 21 robbery.

At some point during Mr. Hills' arrest, Ms. Geter-Hills appeared at the door, and the police told her why they were arresting Mr. Hills. They also told her that they were going to obtain a warrant to search the house and a car parked on the street, and that after doing so, they would return to search for evidence regarding the August 21 robbery. According to Det. Cremen, he told Ms. Geter-Hills that she would not be allowed back into her house unaccompanied until the police had obtained a warrant and completed their search, but she was otherwise at liberty to go wherever she pleased. Ms. Geter-Hills does not contest that she was unrestrained. She told Det. Cremen that if she was not in front of her own house when the police returned, she could be

---

[3] Sgt. Ferguson and Det. Cremen both testified at a December 9, 2009 suppression hearing, and this account of the facts is derived from their testimony and the testimony of Ms. Geter-Hills.

found at a specific neighbor's house, which she pointed out to him. Sgt. Ferguson recalls that Ms. Geter-Hills wanted to get a few items from her home, including a cell phone, and that he allowed her to do so, escorted by a female officer. Thereafter, Ms. Geter-Hills repaired to the neighbor's home to await developments.

The police secured the house at 2059 Medary Avenue, and Sgt. Ferguson and Det. Cremen returned to their headquarters with Mr. Hills, who they placed in a holding cell. Det. Cremen typed up an affidavit and obtained a search warrant, which proposed to authorize the police to search Ms. Geter-Hills' house and the adjacent car for "proof of residence, [a] bank envelope containing $600usc [United States currency], firearms, and any other items pertinent to this investigation." The warrant stated that the police were investigating a "robbery & related offenses."

After the warrant had been approved, but before Mr. Hills had been provided with a Miranda warning, Det. Cremen and Sgt. Ferguson both spoke with Mr. Hills. According to Det. Cremen, he told Mr. Hills that he had a search warrant for 2059 Medary Avenue, and asked Mr. Hills "if there was anything that [the police] would find." Det. Cremen recalls Mr. Hills responding that there would be "a firearm there and some narcotics," and further saying that, "whatever is in there, that's mine." He also recalls Mr. Hills saying, "I don't want her to have anything to do with this," and "this is all mine." Det. Cremens assumed at the time that by "her," Mr. Hills meant his wife, Ms. Geter-Hills. Finally, Mr. Hills informed Det. Cremen that drugs and a gun would be found in a drawer in Mr. Hills' bedroom.

Sgt. Ferguson was not present when Det. Cremens told Mr. Hills about the search warrant, but at some point while Mr. Hills was in the holding cell, Sgt. Ferguson recalls that Mr.

3

Hills asked him, "Sarge, are you guys really going to get a search warrant for the house?" When Sgt. Ferguson said yes, Mr. Hills said something along the following lines: "Oh, my God. Oh, my God. ... Sarge, Sarge, listen. Anything you'll find in the house is mine. Everything you'll find in that house belongs to me." Sgt. Ferguson ended up having three or four conversations with Mr. Hills while Mr. Hills was in the holding cell, and recalls these conversations as follows:

> [Mr. Hills] called me several times. He would yell out through the door, "Sarge, Sarge, Sarge." And I would go back there many times and more or less [say to him], like, "you know, you're really holding us up. Every time you keep calling me we have to stop typing." [And Mr. Hills said,] "Sarge, I want you to be certain everything you find in that house belongs to me. I don't want you locking her up. All that stuff in that house is mine.'"

Later in the morning, Sgt. Ferguson and Det. Cremen returned to 2059 Medary Avenue, accompanied by at least two other officers, and bringing along the search warrant which had been issued.[4] (They joined at least two other officers who had been charged with securing the house.) Det. Cremen testified that the first thing he did when they returned was to go to the neighboring house that Ms. Geter-Hills had identified as the place where she might be waiting. Ms. Geter-Hills was indeed there, and Det. Cremen told her that he had a search warrant.[5] Ms. Geter-Hills

---

[4] There is no dispute as to the procedures and technicalities of the issuance of the search warrant. However, counsel for Ms. Geter-Hills contends that the officers knew enough about the potential drug evidence likely to be found at the house to have included specific reference to an investigation concerning illegal drugs and drug paraphernalia in the probable cause affidavit and the proposed warrant.

[5] Neither Sgt. Ferguson nor Det. Cremens could confidently assert that Ms. Geter-Hills was ever shown the text of the warrant. However, Det. Cremens testified that it is his practice to show a search warrant to a homeowner before he conducts a search, since doing so tends to make the process "go more smoothly." His testimony left the impression that the warrant may have been held up to her briefly, so that Ms. Geter-Hills would have had an opportunity to review or skim its contents. Ms. Geter-Hills testified that the officers never showed her a copy of the warrant.

asked if she could accompany the police while the warrant was executed. The officers acceded to this request, and both testified that they would not have done so had they considered her to be a suspect in the robbery. They agreed that the presence of a suspect during a search of territory familiar to the suspect poses special hazards to officers, and Sgt. Ferguson noted that suspects have a special motive to destroy evidence. Sgt. Ferguson stated expressly that he did not consider Ms. Geter-Hills a suspect when the search began.

The officers testified that they began their search of the house by searching an upstairs bedroom, which appeared to be shared by a man and a woman. The police noticed that the room appeared to be divided: "male" property was on one side; "female" property, including a number of pocketbooks, was on the other. Sgt. Ferguson began by searching the male's dresser, where Mr. Hills had told them that they would find a gun and drugs. In the dresser, the police found a Llama handgun – which was, as Mr. Hills had told the officers his gun would be, hidden in a Christmas stocking – and also over $900 in currency and paraphernalia commonly used in the production of crack cocaine.[6] They did not find cash in a bank envelope.

After finding these items, one or both of the two officers made comments to Ms. Geter-Hills regarding the presence of guns and drugs in a residence that was home to several children. Det. Cremen characterized their comments to Ms. Geter-Hills as follows:

> "I remember ... telling her, look, you know, this guy, you know, Ronald is not a good guy. ... Obviously he had some – he's selling crack from what we found. And you know, there's a loaded gun in the house. You don't need to have this stuff around your kids. ... I remember myself and Sgt. Ferguson talking to her, trying to say: Look, you know, this doesn't need to be going on with your kids. ... That's the conversation, but you know – that was – she – she was agreeing. She's

---

[6] This paraphernalia included a scale, razor blades, small plastic bags, and a plate.

like, "you know, you're right. But I don't know anything about – anything about the crack."[7]

Around this time, Det. Cremens went downstairs, leaving Sgt. Ferguson and Ms. Geter-Hills upstairs in the bedroom. Sgt. Ferguson testified that he asked Ms. Geter-Hills where he would find the cache of crack cocaine that accompanied the paraphernalia, and that she initially denied any knowledge relating to drug activities. Sgt. Ferguson testified that at some point, however, she reversed herself, and told him that the crack cocaine was in one of her pocketbooks, where she had placed it after she heard police arrive that morning; and also that she placed the drugs there in order "to help [Mr. Hills] out." Sgt. Ferguson said that Ms. Geter-Hills identified the specific pocketbook in which the drugs were hidden, and he then recovered the drugs from the pocketbook himself.

Ms. Geter-Hills' account of these events differs somewhat from the version provided by the police. She testified that Sgt. Ferguson asked her repeatedly – from the beginning of the search – where drugs were located; and that she replied: "I thought this was a robbery situation, [so] why are we talking about drugs?" She stated that there were at least four police officers in the bedroom when the officers discovered the paraphernalia and the gun, and she also testified that Sgt. Ferguson became angry when she disavowed knowledge of the location of the drugs:

> [H]e just kept saying, "you better find it, you better find it." He said, "we're not leaving here until we find it." He said, "we'll tear this house upside down and we'll find it." He said, "And then we'll take your children."

Ms. Geter-Hills concedes that in response to Sgt. Ferguson's questioning, she pointed him to several pocketbooks in the bedroom, and that Sgt. Ferguson looked through them until he

---

[7] Det. Cremens characterized all of his interactions with Ms. Geter-Hills as "very cordial," and said that Ms. Geter-Hills was cooperative and polite throughout the search.

found a bag of crack cocaine. However, while Sgt. Ferguson claims that Ms. Geter-Hills told him she hid the drugs when she heard the police arrive that morning, Ms. Geter-Hills testified that she actually had found the drugs very early in the morning – before the police arrived – and that she placed them in the purse because she had "almost ten children in the house" (some of whom were visiting for a sleepover party), and "why would I leave it out for one of the kids to find?" She denied ever telling Sgt. Ferguson that she hid the drugs when she heard the activities relating to the arrest of Mr. Hills.

Sgt. Ferguson testified that after finding the drugs, he brought Ms. Geter-Hills downstairs, conferred with Det. Cremen, and they arrested her. By Sgt. Ferguson's estimation, the entire search lasted about 35 minutes. On cross examination, Sgt. Ferguson acknowledged that by the time he questioned Ms. Geter-Hills about the location of the drugs and then searched her pocketbook, he believed that although the police had not found all the evidence listed in the warrant, they had completed their search for evidence relating to the robbery.

## Discussion

Ms. Geter-Hills now moves to suppress from trial evidence the bag of crack cocaine recovered by Sgt. Ferguson from her pocketbook, on the ground that these drugs were discovered during the course of a search that violated her rights under the Fourth Amendment. In addition, she seeks to suppress statements that she is alleged to have made to police officers incident to the discovery of the bag of crack cocaine. Finally, Ms. Geter-Hills has moved to introduce certain statements made by Mr. Hills while he was at police headquarters. Each of these issues is discussed in turn.

I.      *The Bag of Crack Cocaine*

Ms. Geter-Hills does not contest the validity of the search warrant pursuant to which the police entered her home on the morning of August 22. Instead, she argues that the officers who searched her home exceeded the scope of that warrant, because, she argues, it only authorized them to search for evidence related to the August 21 robbery.

In determining whether the officers violated Ms. Geter-Hills' Fourth Amendment rights, the Court must base its decision on "an objective assessment of the [officers'] actions in light of the facts and circumstances confronting [them] at the time' and not on the [officers'] actual state of mind at the time the challenged action was taken." United States v. Johnson, 63 F.3d 242, 246 (3d Cir. 1995) (citing Maryland v. Macon, 472 U.S. 463, 470-71 (1985)). Therefore, a seizure of evidence that was "valid based upon the stated purpose cannot be challenged on the grounds that the seizing officers were in fact motivated by an improper purpose." United States v. Hawkins, 811 F.2d 210, 214 (3d Cir.); see also Scott v. United States, 436 U.S. 128, 138 (1978) ("the fact that [a searching officer] does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

In this case, the search conducted by Sgt. Ferguson, Det. Cremen, and the other officers was objectively reasonable. The officers conducted the search pursuant to an undisputedly valid warrant. The search was limited to places in Ms. Geter-Hills' home in which the officers might reasonably have expected to find evidence specified in that warrant. Among the places in which the officers might reasonably have expected to find such evidence were the dresser in which Sgt. Ferguson discovered drug paraphernalia and the pocketbook in which he found the bag of crack

cocaine.⁸  Therefore the search did not extend beyond the warrant's scope.

Although Sgt. Ferguson testified, and the Government conceded, that Sgt. Ferguson actually searched Ms. Geter-Hills' pocketbook looking for a cache of drugs – an item that was not listed in the warrant – Sgt. Ferguson's reasons for searching the pocketbook are irrelevant to the reasonableness of that search, which must be evaluated objectively.⁹  The question presented is not what motivated Sgt. Ferguson to search the pocketbook, but whether his looking there was reasonable in the context of the warranted search that he was conducting.

Finally, while Sgt. Ferguson testified that he believed that he had finished searching for robbery evidence by the time that Ms. Geter-Hills told him where to find the drug cache, this subjective belief is not relevant to the question of whether subsequent searching was unlawful. When Sgt. Ferguson found the bag of drugs, the police had neither departed from the house <u>en masse</u>, nor had they found all of the evidence specified in the warrant.¹⁰  Moreover, Sgt. Ferguson was only one of several officers in the house, and his individual and unvocalized belief that the search had been completed did not control his colleagues, just as it does not control the Court's considerations of the lawfulness of his activity.   What is relevant here is that no observable facts on the record suggest that a reasonable search for robbery evidence had been

---

⁸  The fact that Sgt. Ferguson opened the pocketbook does not present a problem. "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." United States v. Ross, 456 U.S. 798, 821 (1982).

⁹  Johnson, 63 F.3d at 246.

¹⁰  As noted above, the police had not found the bank envelope – a key piece of evidence relating to the August 21 robbery.  In addition, because the officers were not yet sure if any of the cash they had found in the dresser was cash that had been taken during the robbery, they would have been justified in continuing to search the house for additional cash, something that certainly could be in a pocketbook.

9

terminated at the time the drugs were discovered.

For these reasons, Ms. Geter-Hills motion to suppress the drugs is denied.[11]

## II. *The Statement of Sheree Geter-Hills*

As noted above, the Government and Ms. Geter-Hills dispute what, exactly, Ms. Geter-Hills may have said to Sgt. Ferguson regarding the drugs. However, Ms. Geter-Hills argues that whatever she said should be considered presumptively involuntary – and therefore should not be admissible against her at trial – because by the time she pointed Sgt. Ferguson to the pocketbook, she contends she had already been placed in custody and had not been provided with, or waived, her Miranda rights.[12] The Government responds that Ms. Geter-Hills was not in custody when the statements in question were made, which means that her right to receive the Miranda warnings had not yet attached. See, e.g., Illinois v. Perkins, 496 U.S. 292, 296 (1990) (noting that the warnings need only be provided to persons who have been "taken into custody").

Generally speaking, "[a] person is in custody when he either is arrested formally or his freedom of movement is restricted to the degree associated with a formal arrest." United States

---

[11] This conclusion does not rest on the Court's determination that Ms. Geter-Hills' statements to Sgt. Ferguson regarding the location of the drugs are admissible. Even if the Court were to determine that Ms. Geter-Hills' Miranda rights had been violated, physical evidence that was collected based on her statements could still be admissible under various circumstances. United States v. Patane, 542 U.S. 630, 643 (2004); United States v. DeSumma, 272 F.3d 176, 177 (3d Cir. 2001).

[12] In order to protect the Fifth Amendment rights of individuals who are suspected of committing a crime, the Supreme Court has held that suspects in custody must be provided with a set of warnings before they are subjected to interrogation. Miranda v. Arizona, 384 U.S. 436 (1966). Any statements that have been made by a suspect in custody prior to the administration and voluntary waiver of Miranda rights are "irrebuttably presumed involuntary," and may not be used in the prosecution's case-in-chief. United States v. Green, 541 F.3d 176, 186 (3d Cir. 2008) (citing United States v. Pacheco-Lopez, 531 F.3d 420, 424 (6th Cir. 2008); Missouri v. Seibert, 542 U.S. 600, 608 (2004)).

10

v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006). Where there is no formal arrest, "something must [have been] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicate[d] that they would not have heeded a request [by the suspect] to depart or ... allow[ed] the suspect to do so." Id. (quoting Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974)). Courts in the Third Circuit consider the following factors when determining whether a suspect was in custody: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." Id. (internal citations omitted).[13]

The application of these factors to this case yields the conclusion that Ms. Geter-Hills was not in custody when she spoke with Sgt. Ferguson about the drugs. Not only did the interaction between the police and Ms. Geter-Hills take place within her own home,[14] but the police officers informed her that she could choose whether or not to accompany them during their search. Her movement was not restricted; she was not frisked; and she was not told that she was under arrest

---

[13] See also United States v. Long, 2008 U.S. Dist. LEXIS 99762, *7 (E.D. Pa. Dec. 9, 2008); United States v. Prawdzik, 2008 U.S. Dist. LEXIS 64668, *3 (E.D. Pa. Aug. 20, 2008); United States v. Fleet Mgmt., 2008 U.S. Dist. LEXIS 37161, *33 (E.D. Pa. May 7, 2008); United States v. Vongnarath, 2008 U.S. Dist. LEXIS 40616, *2-3 (E.D. Pa. May 19, 2008).

[14] This militates against a custody finding. See, e.g., United States v. Vidal, 85 Fed. Appx. 858, 861 (3d Cir. 2004) (the fact that federal agents questioned the suspect in his own home "clearly made it less likely, given the other circumstances, that a reasonable person in [his] position would have felt he was unable to end the questioning"); United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) ("[w]hen a person is questioned 'on his own turf,' ... we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation'"); United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) ("courts are much less likely to find [custody] when the interrogation occurs in familiar ... surroundings such as the suspect's home").

until some time after she had made the statements at issue. In fact, Sgt. Ferguson credibly testified that he did not think of Ms. Geter-Hills as a suspect until after she had told him that she herself had hidden the drugs.[15] The officers' guns were holstered when they returned to the house with the warrant and while they were conducting their search of the house, and the record provides substantial reason to believe that the discourse between Ms. Geter-Hills and the officers was relatively amiable. Finally, given that the entire search lasted only about 35 minutes, Ms. Geter-Hills could not have been questioned at great length. She certainly was not subjected to intensive "grilling" or the like.

The only substantial piece of evidence that might call into question the voluntariness of Ms. Geter-Hills' statement is her claim that Sgt. Ferguson, while searching the bedroom for the drugs, threatened to take her children. However, Ms. Geter-Hills' account is contradicted by both Sgt. Ferguson and Det. Cremen, who testified that although the officers admonished Ms. Geter-Hills for allowing her husband to bring drugs and a gun into a home where there were children present, he never raised the possibility of having Ms. Geter-Hills' children removed from the home as a means of coercing her cooperation with the investigation. Ms. Geter-Hills herself volunteered her discomfort with having drugs accessible to children when she explained her version of when and why she placed the drugs in her pocketbook. It does not appear that she questioned the officers or otherwise challenged them when they allegedly threatened to remove her children from her care. If Ms. Geter-Hills somehow imagined that she was being warned

---

[15] This also militates against a custody finding. See Steigler v. Anderson, 360 F. Supp. 1286, 1291 (D. Del. 1973), aff'd 496 F.2d 793 (3d Cir. 1974) (an "important consideration in determining the existence of 'custodial interrogation' is whether or not the investigation was then 'focused' on the suspect") (citing United States v. Hall, 421 F.2d 540, 543 (2d Cir. 1969)).

12

about the possible loss of her children, the Court, having found the officers' account of the exchange convincing, will not allow Ms. Geter-Hills' interpretation to control the finding of voluntariness.

On the whole, the circumstances of this case are less suggestive of a custodial interrogation than those of other cases in which the Court of Appeals for the Third Circuit has held that no custody existed.[16] Because the Court finds that Ms. Geter-Hills was not in police custody when she spoke to Sgt. Ferguson about the drugs, and also that Ms. Geter-Hills spoke to Sgt. Ferguson voluntarily, her motion to suppress her statements is denied.

### III. *The Statements of Ronald Hills*

Ms. Geter-Hills has also moved to introduce statements made by her husband and co-defendant, Ronald Hills, in the event that Mr. Hills exercises his Fifth Amendment right not to testify at trial.[17] Specifically, she seeks to introduce the "self-inculpatory statement" made by Mr. Hills to the police officers while he was in the holding cell, and asserts that Mr. Hills told Sgt. Ferguson and Det. Cremen that the "police ... would find crack cocaine and a gun in Ms. Geter-Hills' house, that the contraband belonged to him, and that it did not belong to Ms. Geter-Hills."

Although any such statements are hearsay, they could conceivably be admissible in Ms.

---

[16] See, e.g., Vidal, 85 Fed. Appx. 858 (finding no custody where fourteen federal agents spent over three hours with the suspect, interrogated him for an hour and fifteen minutes, and closely monitored his movements around his home).

[17] Currently, Ms. Geter-Hills and Mr. Hills are scheduled to be tried together in one trial. Severance of their prosecutions is also a serious option.

Geter-Hills' trial if Mr. Hills declines to testify and is therefore considered unavailable.[18] Where a witness is not available in a criminal case, Federal Rule of Evidence 804(b)(3) allows for the admission of a statement, which:

> ... at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.[19]

What, exactly, Mr. Hills said to Det. Cremen and Sgt. Ferguson while he was in the holding cell is not clear from the record of the suppression hearing, and the meaning of the words that the two officers attribute to Mr. Hills is ambiguous. According to the officers, Mr. Hills told them about a gun and crack cocaine, and also made various statements along the following lines: "whatever is in there, that's mine," "this is all mine," "anything you'll find in the house is mine," "everything you'll find in that house belongs to me," and "all that stuff in that house is mine." Taken in context, these words might be reasonably interpreted as having been intended to convey three relevant and conceptually distinct pieces of information: (1) that there were narcotics and a gun in the dresser in the bedroom at 2059 Medary Avenue; (2) that the drugs and gun belonged to Mr. Hills; and (3) that the drugs and gun did not belong to Ms. Geter-Hills.[20]

---

[18] A potential witness who invokes his Fifth Amendment rights against self-incrimination is considered unavailable under Federal Rule of Evidence 804(a)(1). See, e.g., United States v. Ioannucci, 1989 U.S. Dist. LEXIS 1059, *8 (E.D. Pa. Feb. 7, 1989).

[19] Fed. R. Evid. 804(3)(b).

[20] Mr. Hills' intention in making the statements is relevant because while Rule 804(b)(3) has an objective component – it asks whether a reasonable person in the declarant's position would not have made the statement unless believing it to be true – what Mr. Hills meant to say is integral to the question of whether his hearsay statements have that special indicia of

14

That Mr. Hills desired to impart the first two meanings is clear. It is also clear that to the extent that he was saying either of these things, he was making an archetypical statement against penal interest. Mr. Hills believed, accurately, that the police were going to search the house, and a reasonable person in his position would understand that each of these two pieces of information could handicap his defense by foreclosing his ability to credibly argue (1) that he was unaware of the contraband, or (2) that its sole owner was Ms. Geter-Hills or a third party.

In addition, corroborating circumstances indicate the trustworthiness of Mr. Hills' assertions. The police found a handgun and crack cocaine where Mr. Hills said they would be, and Sgt. Ferguson indicated that he found these items on what appeared to be the "male" side of the bedroom.[21] In addition, the statements attributed to Mr. Hills are consistent with credible statements made by Ms. Geter-Hills during the suppression hearing. Whatever may have motivated Mr. Hills to make these statements to police – including a desire to protect his wife from criminal liability – they have sufficient indicia of reliability to be presented to, and evaluated by, the finder of fact in Ms. Geter-Hills' trial.

However, it may not be clear that Mr. Hills' statements ought to be interpreted to exculpate Ms. Geter-Hills. Although Mr. Hills asserted ownership of the gun and drugs, and expressed a desire that the police not arrest Ms. Geter-Hills, he never said explicitly that he was the <u>exclusive</u> owner of these items. Generally speaking, the question of how to interpret admissible statements is left to the finder of fact. In this case, a certain ambiguity flows from the

---

reliability that might separate them from inadmissible hearsay.

[21] The police actually found two handguns, but one of these was an old and possibly inoperable Smith & Wesson registered to Ms. Geter-Hills' grandmother. The fact that Mr. Hills did not mention two guns does not undermine the corroborative effect of his statement.

role of the word "all" in some of the statements at issue. Did Mr. Hills use the word "all" to indicate that he owns every single piece of contraband, or rather to suggest exclusive or sole ownership? Moreover, it is not so clear that any statements that were intended to exculpate Ms. Geter-Hills would have been statements against penal interest, thus possibly calling into question their admissibility.

Thus, while the Court holds that Mr. Hills' statements to the officers are admissible as admissions of ownership, the Court will, prior to the trial, hear arguments from counsel regarding the full extent of the statements' admissibility as evidence exculpating Ms. Geter-Hills – that is, as evidence to reduce or exclude the possibility that she was also a co-owner of these items. In preparing to argue this question, counsel are advised to review the Supreme Court's opinion in Williamson v. United States, 512 U.S. 594 (1994), and also to consider Judge Caldwell's opinion in Ciccarelli v. Gichner Sys. Group, 862 F. Supp. 1293 (M.D. Pa. 1994), which, although not binding on this Court, provides a thoughtful and germane analysis of the Williamson opinion.

In light of these considerations, and recognizing that this issue may very well implicate the issue of severance of Mr. Hills and Ms. Geter-Hills for trial purposes, Ms. Geter-Hills' motion is granted insofar as she seeks to introduce Mr. Hills' statements regarding the existence and location of the contraband, and also his ownership thereof. However, the Court reserves judgment for the moment on the question of whether any of Mr. Hills' statements – including any summary or version of those statements that differs in any respect from the versions that Sgt. Ferguson and Det. Cremen provided while testifying at the suppression hearing – may be

admitted for their truth as evidence that Ms. Geter-Hills was not a co-owner of the contraband.[22]

**CONCLUSION**

Ms. Geter-Hills' Motion In Limine to Suppress Evidence is denied. The bag of crack cocaine and Ms. Geter-Hills' statements to Sgt. Ferguson and other officers incident to the search may be admitted into evidence in her trial.

Ms. Geter-Hills' Motion In Limine Regarding the Admissibility of Co-Defendant Ronald Hills' Statements is granted insofar as Ms. Geter-Hills seeks to introduce Mr. Hills' statements to show knowledge of the existence and location of the contraband, and also his ownership thereof. However, the Court holds the Motion in abeyance insofar as Ms. Geter-Hills seeks to introduce any of Mr. Hills' statements for other purposes, including to show that Ms. Geter-Hills was not a joint owner of the contraband.

---

[22] Except to recognize the severance issue, the Court need not concern itself at present with the resolving the question of whether Mr. Hills' statements are admissible against Mr. Hills himself. There is no evidence yet formally presented to suggest that these statements were made involuntarily, and even if the Court were to hold at some point that they were elicited by police in violation of Mr. Hills' Miranda rights, the Government could not invoke this violation in order to challenge the statements' introduction in Ms. Geter-Hills' trial.